IN THE SUPREME COURT OF TENNESSEE
June 3, 2021 Session[1]

## STATE OF TENNESSEE v. URSHAWN ERIC MILLER

**Automatic Appeal from the Court of Criminal Appeals
Circuit Court for Madison County
No. 16-435   Donald H. Allen, Judge**

_____

### No. W2019-00197-SC-DDT-DD

_____

A Madison County jury convicted the defendant, Urshawn Eric Miller, of first-degree premeditated murder and first-degree felony murder for fatally shooting a convenience store employee during an attempted robbery of the store. The jury also convicted the defendant of the attempted second-degree murder of another store employee and of attempted especially aggravated robbery, aggravated assault, employing a firearm during the commission of a dangerous felony, evading arrest, and resisting arrest. The jury imposed the death penalty for the first-degree murder convictions. The trial court merged the felony murder conviction into the premeditated murder conviction and the aggravated assault conviction into the attempted second-degree murder conviction, and it imposed an effective thirty-year sentence for the remaining convictions to run concurrently with the death sentence. The Court of Criminal Appeals affirmed the convictions and sentences but vacated the application of the felony murder aggravating circumstance as to the felony murder conviction. Upon our automatic review, we conclude: (1) the trial court properly ruled on challenges to certain jurors for cause during individual voir dire; (2) the evidence was sufficient to establish the defendant's identity as the perpetrator and his guilt of the convicted offenses; (3) the trial court did not abuse its discretion by allowing the State to introduce a video recording of the defendant's prior aggravated robbery during the penalty phase; (4) the death penalty generally, and lethal injection specifically, do not constitute cruel and unusual punishment; and (5) the death sentence satisfies our mandatory review pursuant to Tennessee Code Annotated section 39-13-206. Accordingly, we affirm the defendant's convictions and sentence of death; however, we reverse the portion of the intermediate court's judgment vacating the application of the felony murder aggravating circumstance.

**Tenn. Code Ann. § 39-13-206(a)(1) (2018) Appeal; Judgment of the
Court of Criminal Appeals Affirmed in Part, Reversed in Part**

---

[1] We heard oral argument through videoconference under this Court's emergency orders restricting court proceedings because of the COVID-19 pandemic.

ROGER A. PAGE, C.J., delivered the opinion of the Court, in which JEFFREY S. BIVINS, and HOLLY KIRBY, JJ., joined. SHARON G. LEE, J., filed a separate opinion concurring in part and dissenting in part. CORNELIA A. CLARK, J., not participating.[2]

Jeremy B. Epperson, District Public Defender (on appeal); George Morton Googe,[3] District Public Defender, and Gregory D. Gookin, Assistant District Public Defender (at trial and on appeal), Jackson, Tennessee, for the appellant, Urshawn Eric Miller.

Herbert H. Slatery III, Attorney General and Reporter; Andrée Sophia Blumstein, Solicitor General; Nicholas W. Spangler, Senior Assistant Attorney General; Jody Pickens, District Attorney General; and Shaun A. Brown and Al Earls, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

### I. FACTUAL & PROCEDURAL BACKGROUND

On November 25, 2015, a man wearing black clothing, gray gloves, and a white face covering entered the Bull Market in Jackson, Tennessee. The man pointed a gun at the twenty-four-year-old clerk, Ahmad Dhalai, and instructed him to "Drop that sh*t off or I'ma shoot you dead in the head." The man looked briefly in the direction of another employee, Lawrence Austin, before turning back to Mr. Dhalai stating, "Drop that sh*t off." The man fired an initial shot that barely missed Mr. Dhalai's head. As Mr. Dhalai slowly turned to walk away, the man again demanded, "Drop that sh*t off. Quit playing." The man then shot Mr. Dhalai in the back of the head. Next, he fired a shot in the direction of Mr. Austin and jumped over the counter. He banged on the cash register with his elbow to no avail before jumping back over the counter and fleeing the store. Mr. Dhalai died moments later. The entire encounter was captured on the store's surveillance cameras.

The defendant, Urshawn Eric Miller, was charged with first-degree murder, first-degree murder in perpetration of attempted especially aggravated robbery, attempted especially aggravated robbery, attempted first-degree murder, aggravated assault, employing a firearm in the attempt to commit a dangerous felony, being a convicted felon in possession of a handgun, resisting arrest, and evading arrest. The trial began on February 26, 2018.

---

[2] Sadly, our honored colleague and friend Justice Clark passed away on September 24, 2021.

[3] George M. Googe retired as the District Public Defender while this appeal was pending. He was replaced by Jeremy Epperson, who represented the defendant at oral argument before this Court.

At trial, Mr. Austin testified that he worked at the Bull Market cleaning up, restocking, and doing other tasks as needed. He was mopping on the night of November 25, 2015, when he remembered a man entering the store. He explained that the man was wearing dark clothing, had "something on his face," and that he "believe[d] the person was black." He heard the man say, "Drop it off." Still, Mr. Austin was not concerned until he heard a gunshot. He moved toward one of the store's refrigerators to attempt to hide himself. The masked man pointed the gun at Mr. Austin and fired. Mr. Austin then witnessed the man jump over the counter before fleeing the store. He briefly chased after the man but did not see which direction the man ran.

In addition to Mr. Austin, the brief encounter was witnessed by Abdul Saleh, the victim's cousin, who was also working that evening and whose brother owned the market. Mr. Saleh was in the rear of the store in the restroom when he heard what he described as a "loud pop" followed by two more "pops." As he proceeded to the front of the store, Mr. Saleh saw Mr. Dhalai on the floor with blood around his head and observed the man standing in front of the cash register. Fearing he could also be shot, Mr. Saleh retreated to the office until the man left the market. Mr. Saleh attempted to render aid to Mr. Dhalai and called 911.

Mr. Saleh's fourteen-year-old son, Foad, was riding his bicycle in the parking lot when he heard two or three gunshots. He witnessed "a black man who was coming outside and out the store." He testified that the man he saw leaving the market was dressed in a black hoodie and black pants and was wearing a white mask. Foad Saleh gave the police a description of the man and the direction the man fled.

Timothy Sinclair, Sr., a regular customer, testified that he had just left the market with his purchases. While loading his purchases in his truck, he saw a black male wearing dark-colored clothing, a hoodie, and something white across his face coming around the side of the market. Just as the man entered the store, Mr. Sinclair saw a gun in the man's hand. Mr. Sinclair explained that he stood frozen and, a few seconds later, heard shots fired inside the store. He quickly got in his truck and started to back out of the parking lot when he saw the man run out of the store and around the side of the building. Mr. Sinclair then called 911.

Officer Kevin Livingston arrived on the scene within two minutes. At the "chaotic" scene, Officer Livingston observed Mr. Saleh behind the counter applying pressure to Mr. Dhalai's head which had a "pretty massive exit wound" with "blood, brain matter on the floor." Mr. Dhalai made shallow "gurgling" sounds but did not have a pulse. Lieutenant Shane Beaver also arrived quickly and secured the scene. After learning of the suspect's description and direction of travel, Lieutenant Beaver directed the approximately twenty officers in the area to set up a perimeter and deployed K-9 Officer Jeremy Stines.

Officer Stines and his dog, Pax, tracked the suspect to a wooded area near Lions' Field at Lambuth University where he was hemmed in by the officers. According to Lieutenant Beaver, despite repeated instructions to come out of the woods, the suspect resisted and shouted "F*ck you. You're going to have to come in here and get me" and "You might get me, but I'm going to take one of your mother f*ckers with me." Because the suspect refused to surrender, Officer Stines released Pax in an attempt to force the suspect out of the woods. Pax bit the suspect on the shoulder and they both tumbled to the ground. Officer Stines hit the suspect in the head with his gun when he refused to release his hands from around the dog's throat. Officer Kyle Hamilton ultimately used his taser to subdue the suspect. The suspect, later identified as the defendant, was handcuffed and placed in a patrol car where he was transported initially to the hospital for treatment of the dog bite and then to the jail.

The officers who remained on the scene searched the immediate area and recovered various items including a black jacket with a hood, black pants, a belt, gray gloves, a portion of a white t-shirt, a cell phone, a .38 caliber revolver, and keys. Investigator Marvin Rodish, Jr. viewed the revolver and recovered three spent shell casings and three live rounds from inside the cylinder of the firearm. He later collected three "projectiles," or bullet fragments, from inside the market.

Investigator Dan Long executed a search warrant at the defendant's residence. The keys previously found near Lions' Field unlocked the door to the house and the trunk of a car registered to the defendant that was parked near that house. A portion of a torn white t-shirt was collected from the defendant's bedroom.

Dr. Eric Warren, who was employed by the Tennessee Bureau of Investigation ("TBI") as a Special Agent Forensic Scientist, examined and test fired the .38 special revolver found at the scene. He concluded the three spent casings recovered from the revolver had been fired from the gun. As for the three "projectiles" collected from the crime scene, Dr. Warren explained that they had "class characteristics to indicate that the revolver . . . could have fired them." However, due to the damage, he could not state with certainty that the bullet fragments were fired from the revolver.

TBI Special Agent Charly Castelbuono testified that she found the defendant's DNA to be the "major contributor" on the white t-shirt fragment, the inside of the left gray glove, the hooded sweatshirt, the black pants, and the revolver.[4] In addition, TBI Special Agent Reilly Gray determined that the gray gloves tested positive for gunshot residue, and TBI

---

[4] Special Agent Castelbuono also testified that the t-shirt fragment had a blood stain that matched the defendant. This was in addition to the DNA swab of the item.

Special Agent Miranda Gaddes concluded that the t-shirt portion recovered from the woods was cut or torn from the t-shirt found in the defendant's bedroom.

At the close of the State's proof, the defendant moved for a judgment of acquittal. The trial court denied the motion with the exception of the count of attempted first-degree murder of Mr. Austin, which the court reduced to attempted second-degree murder upon finding that the State had not established premeditation on that count. The defendant chose not to testify and presented no evidence. The jury found the defendant guilty of the first-degree premeditated murder, first-degree felony murder, and attempted especially aggravated robbery of Mr. Dhalai, the attempted second-degree murder and aggravated assault of Mr. Austin, employment of a firearm during the commission of a dangerous felony, evading arrest, and resisting arrest. The State moved to dismiss the felon in possession of a firearm offense, and the trial court granted the motion.

As the penalty phase began, the trial court instructed the jury regarding its duty to impose punishment for the first-degree murder convictions. The court explained that Tennessee law provides three possible punishments for first-degree murder: death, imprisonment for life without the possibility of parole, or imprisonment for life.

In its opening remarks, the State advised the jury that it was seeking the death penalty based on the (i)(2) (prior violent felony) and (i)(7) (felony murder) statutory aggravating circumstances. *See* Tenn. Code Ann. § 39-13-204(i) (2018 & Supp. 2020) (listing the statutory aggravating circumstances for imposition of the death penalty or the sentence of imprisonment for life without possibility of parole). The State averred that the jury had essentially already found the (i)(7) aggravating circumstance by its guilty verdict on the felony murder count. Consequently, the State narrowed its proof to the (i)(2) aggravating circumstance. To that end, the State presented a certified copy of a May 27, 2009 judgment of conviction for an aggravated robbery that occurred in Madison County, Tennessee, on September 26, 2008, for which the defendant received an eight-year sentence. Captain Jeff Fitzgerald of the Madison County Sheriff's Department testified that he investigated the 2008 robbery of the Riverside Express convenience store. He recalled that the defendant surrendered and gave a statement admitting his participation in the robbery. The State introduced a written statement signed by the defendant admitting to his participation in 2008 robbery.

Alison Deaton testified that she was employed at Riverside Express on September 26, 2008, when three armed men with face coverings entered the store. The defendant was identified as one of the men. According to Ms. Deaton, one of the men demanded, "B*tch, give me all your money or I'm going to shoot you in the mother f*cking face." Ms. Deaton complied with the robber's demand and opened the cash register. A video recording of the robbery from the store's surveillance cameras was admitted into evidence. The video

showed the three men entering the store with guns pointed at Ms. Deaton, jumping over the counter, and taking cash from the cash register.

The State also presented victim impact testimony from Ali Dhalai, the victim's cousin, who served as the family representative.[5] Mr. Dhalai said that the victim was from a close family with seven brothers and sisters. He explained that the victim worked at the Bull Market and studied radiology at the community college. Mr. Dhalai described the victim as a hard worker and a "kind, caring, giving person" who loved his family. After the victim's death, Mr. Dhalai learned that the victim had been contributing to various charities, including the Red Cross. He said the family remains heartbroken by the loss.

The defendant opened the mitigation proof with the testimony of Dr. James Walker, a psychologist board certified in both neuropsychology and forensic psychology. Dr. Walker met with the defendant in jail where he administered a "comprehensive battery of psychological tests." In addition, he reviewed the defendant's educational, employment, and social histories, including interviews of the defendant's family members. The records revealed that the defendant's mother smoked marijuana heavily when she was pregnant with the defendant. The defendant was initially abandoned by his father, and his mother had a succession of abusive boyfriends and husbands. One of the father figures tortured the defendant by instructing him to pour alcohol on his penis. His mother often referred to the defendant as "dumb" or "stupid." As a result, he was often in the care of his alcoholic grandmother who also mistreated him.

Dr. Walker testified that the defendant had an intelligence quotient ("IQ") of 78 at age eight and 85 at age twelve according to the records he reviewed. When tested by Dr. Walker in January 2017, the defendant had an IQ of 86, which meant that he functioned "somewhere around the 18th percentile . . . as compared to the average person." The defendant also scored very poorly on several other tests performed by Dr. Walker, notably those scoring his memory and ability to focus. The defendant dropped out of school in the tenth grade and had a limited employment history, working briefly in a warehouse and as a fast food cook. The defendant smoked excessive amounts of marijuana for many years. A number of the defendant's family members also have problems with chronic substance abuse, and some of his close family members are incarcerated for committing violent crimes. The defendant was shot in the back when he was a teen. He also spent several years

---

[5] The trial court conducted a jury-out preview of Mr. Dhalai's testimony and ruled that the State could present the same testimony in the presence of the jury. *See State v. Nesbit*, 978 S.W.2d 872, 891 (Tenn. 1998) ("To enable the trial court to adequately supervise the admission of victim impact proof, we conclude that the State must notify the trial court of its intent to produce victim impact evidence. Upon receiving notification, the trial court must hold a hearing outside the presence of the jury to determine the admissibility of the evidence.").

in prison. Based on this genetic background, Dr. Walker said the defendant was predisposed to getting involved in these kinds of problems. He diagnosed the defendant with several psychiatric conditions including cognitive disorders, cannabis use disorder, post-traumatic stress disorder ("PTSD"), and antisocial personality disorder.

The defense also called Dr. Keith Caruso, who is board certified in general and forensic psychiatry. Dr. Caruso interviewed the defendant, conducted a joint interview with the defendant's mother, and interviewed two of the defendant's aunts. Dr. Caruso also reviewed police records, mental health records, legal records, photos, videos, and medical records, along with psychological reports and mitigation memoranda. Like Dr. Walker, Dr. Caruso placed significance on the defendant's unstable childhood, abuse, and neglect. He also noted that the defendant had Attention Deficit Hyperactivity Disorder ("ADHD") as a child, and he agreed that the defendant had a genetic predisposition to antisocial personality disorder, substance abuse disorder, and fit the diagnosis for PTSD. Dr. Caruso admitted, however, that the defendant appreciated the wrongfulness of his conduct, and he agreed the defendant developed a plan to rob the market and made the choice to kill someone.

In rebuttal, the State called Dr. Kimberly Brown, a forensic psychologist who serves as an associate professor of clinical psychiatry and director of the forensic evaluation team at Vanderbilt University Medical Center. Dr. Brown interviewed the defendant at the jail and conducted a telephone interview with the defendant's mother. She reviewed extensive documents, videos, photos, and the expert reports of Drs. Walker and Caruso. Dr. Brown noted the defendant's disadvantaged childhood, including abuse and neglect at the hands of his mother and father figures as well as the significant family history of substance abuse. She acknowledged a connection between marijuana exposure in the womb and ADHD and low IQ in the child. As to the defendant's IQ of 86, Dr. Brown disagreed that the defendant had borderline intellectual functioning. In her view, the defendant was considered "low-average," which she described as "pretty typical for a criminal defendant." Dr. Brown agreed that the defendant had antisocial personality disorder, cannabis use disorder, and a history of ADHD. Despite the defendant's exposure to several significant traumas, Dr. Brown disagreed that the defendant met the criteria to be diagnosed with PTSD.

The trial court gave the jury additional penalty phase instructions including how the jury should consider the statutory aggravating and mitigating circumstances in its determination of punishment. The jury imposed a sentence of death for both the first-degree premeditated murder and first-degree felony murder convictions. It found that the State had proven the two aggravating circumstances beyond a reasonable doubt, and the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt. The trial court merged Count 2 (felony murder) into Count 1 (premeditated murder). At a subsequent sentencing hearing, the trial court imposed an effective sentence of thirty years for the remaining convictions to run concurrently with the sentence of death.

7

The Court of Criminal Appeals affirmed the convictions and sentences. *State v. Miller*, No. W2019-00197-CCA-R3-DD, 2020 WL 5626227, at \*24 (Tenn. Crim. App. Sept. 18, 2020). However, as discussed below, the intermediate court vacated the application of the (i)(7) aggravating circumstance to the felony murder conviction. *Id.* at \*21. The Court of Criminal Appeals also remanded the case to the trial court to correct a clerical error in the judgment for Count 8, resisting arrest. *Id.* at \*24. This appeal followed.

## II. ANALYSIS

### A. Jury Selection

In three related issues, the defendant complains that the trial court erred by either removing or failing to remove prospective jurors for cause during individual voir dire based on their views on the death penalty. The underlying contention is that these rulings by the trial court denied the defendant his right under the United States and Tennessee Constitutions to an impartial jury.[6] U.S. Const. amend VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . .); Tenn. Const. art. I, § 9 ("That in all criminal prosecutions, the accused hath the right to . . . a speedy public trial, by an impartial jury . . . .). In our legal system, impartiality of the jury venire is assessed during the voir dire process. *See State v. Sexton*, 368 S.W.3d 371, 395 (Tenn. 2012). Voir dire in a capital case is unique in that the jury ultimately seated will initially be tasked with determining the defendant's guilt or innocence during a guilt phase. *See State v. Thomas*, 158 S.W.3d 361, 390 (Tenn. 2005). If the jury finds the defendant guilty of first-degree murder, the same jury will determine in a separate penalty phase whether his punishment should be imprisonment for life, imprisonment for life without the possibility of parole, or death. Tenn. Code Ann. § 39-13-204(a) ("Upon a trial for first degree murder, should the jury find the defendant guilty . . . it shall not fix punishment as part of the verdict, but the jury shall fix the punishment in a separate sentencing hearing . . . . The separate sentencing hearing shall be conducted as soon as practicable before the same jury that determined guilt . . . ."). Due to this potential penalty phase, the impartiality of potential jurors with respect to punishment must be assessed during the singular voir dire process.

This questioning of the venire regarding punishment, commonly known as "death qualification," *see, e.g.*, *Lockhart v. McCree*, 476 U.S. 162, 167 (1986), is routinely conducted during individual voir dire.[7] To be "death qualified" under our current law, a

---

[6] Generally speaking, an "impartial jury" consists of jurors who will "conscientiously apply the law and find the facts." *See Wainwright v. Witt*, 469 U.S. 412, 423 (1985).

[7] We note that there is no requirement that death qualification be conducted by individual voir dire. *State v.*

potential juror must possess the ability to consider all three forms of punishment. *See, e.g.*, *Sexton*, 368 S.W.3d at 390. Often guided by responses provided in jury questionnaires, the parties attempt to ascertain the potential jurors' views on punishment with the focus on the death penalty. Based on a juror's collective responses, a party may move to challenge the potential juror for cause. *See* Tenn. R. Crim. P. 24(c)(1). A party may use peremptory challenges[8] to strike a juror who was not excused for cause. *See* Tenn. R. Crim. P. 24(e). A capital defendant "has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause." *Uttecht v. Brown*, 551 U.S. 1, 9 (2007) (citing *Witherspoon v. Illinois*, 391 U.S. 510, 521 (1968)). On the other hand, "the State has a strong interest in having jurors who are able to apply capital punishment within the framework state law prescribes." *Id.* (citing *Wainwright v. Witt*, 469 U.S. 412, 416 (1985)).

In *Wainwright v. Witt*, the United States Supreme Court adopted a standard to be utilized when a potential juror is challenged for cause based on his or her views on the death penalty: The trial court must determine whether the potential juror's views would "prevent or substantially impair the performance of his duties as juror in accordance with his instructions and his oath." *Wainwright*, 469 U.S. at 424 (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)). This standard, which we refer to as the "*Wainwright* standard,"[9] does not require that a juror's bias be proven with "unmistakable clarity." *See id.* at 424-25 (recognizing that some in the venire simply cannot be asked enough questions to establish their bias on the "printed record"). In certain instances, a potential juror may be excused for cause when the trial judge is left with the "definite impression" based on the juror's demeanor that he or she would be unable to follow the law. *Id.* at 426.

We will also take this opportunity to clarify the standard of review that our appellate courts should employ when reviewing a trial court's decision concerning a juror under the *Wainwright* standard. The *Wainwright* court determined that a reviewing federal court must

---

*Austin*, 87 S.W.3d 447, 471 (Tenn. 2002) (adding that it is within the trial court's discretion to allow individual voir dire of prospective jurors).

[8] In a capital case, each defendant is allowed fifteen peremptory challenges, and the State is entitled to fifteen peremptory challenges per defendant. If the trial court elects to seat alternate jurors, "[f]or each additional juror selected pursuant to Rule 24(f), each side is entitled to one peremptory challenge for each defendant. Such additional peremptory challenges may be used against any regular or additional juror." Tenn. R. Crim. P. 24(e)(4).

[9] This standard is also referred to as the *Witherspoon-Witt* Rule. The *Wainwright* court clarified the earlier standard announced in *Witherspoon v. Illinois*, 391 U.S. 510 (1968), in which the Court held that "the State infringes a capital defendant's right under the Sixth and Fourteenth Amendments to trial by an impartial jury when it excuses for cause all of those members of the venire who express conscientious objections to capital punishment." *Wainwright*, 469 U.S. at 416.

accord the factual findings of the state trial court a presumption of correctness under the federal habeas corpus statute because these findings are "based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province." *Id.* at 428 (citing *Patton v. Yount*, 467 U.S. 1025, 1038 (1984)).[10] Following that decision, this Court, in *State v. Alley*, "th[ought] it appropriate to adopt the same standard of review prescribed in *Wainwright*," and stated that "the trial court's finding of bias of a juror because of his views of capital punishment shall be accorded a presumption of correctness and the burden shall rest upon the appellant to establish by convincing evidence that that determination was erroneous." *State v. Alley*, 776 S.W.2d 506, 518 (Tenn. 1989); *see also State v. Schmeiderer*, 319 S.W.3d 607, 633 (Tenn. 2010); *State v. Reid*, 213 S.W.3d 792, 835-36 (Tenn. 2006); *State v. Thomas*, 158 S.W.3d 361, 378 (Tenn. 2005); *State v. Austin*, 87 S.W.3d 447, 473 (Tenn. 2002). However, upon review of relevant case law, it appears that some courts of this state have applied an abuse of discretion standard without referencing the *Alley* standard.[11] *See, e.g.*, *State v. Howell*, 868 S.W.2d 238, 249 (Tenn. 1993). And still others have applied the abuse of discretion standard in conjunction with the *Alley* standard. *See, e.g.*, *Sexton*, 368 S.W.3d at 392-95 (citing *State v. Hugueley*, 185 S.W.3d 356, 390 (Tenn. 2006) (appexdix); *State v. Kilburn*, 782 S.W.2d 199, 203 (Tenn. Crim. App. 1989)). We believe that abuse of discretion is the appropriate standard of review of a trial court's decision concerning a juror's "death qualification." [12] To the extent the standard from *Alley* can be interpreted inconsistently with our decision today, we want to be clear that the abuse of discretion standard shall be used in this context moving forward. Trial judges base their decisions on a full view of the potential jurors' responses to questions during voir dire, including the jurors' facial expressions, degree of candor, and overall demeanor. A trial judge's decision as to a challenge for cause should be reversed

---

[10] The United States Supreme Court reaffirmed this federal standard of review in *Uttecht*. 551 U.S. at 9-10 (adding that "[d]eference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors"). Further, the "presumption" language contained in the federal habeas corpus statute has been moved to section 2254(e)(1), which provides in pertinent part that "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. §2254(e)(1).

[11] While the defendant did not directly raise this issue on appeal, we note that the defendant's brief cited "abuse of discretion" as the standard of review without reference to the *Alley* standard. In contrast, the State referenced both the *Alley* standard and "abuse of discretion" in its brief on appeal.

[12] We note that many non-capital cases mention the abuse of discretion standard when reviewing juror challenges for cause. *See, e.g.*, *State v. Leonard*, No. M2016-00269-CCA-R3-CD, 2017 WL 1455093, at *9 (Tenn. Crim. App. Apr. 24, 2017) (citing *Hugueley*, 185 S.W.3d at 378), *perm. app. denied*, (Tenn. Aug. 16, 2017); *State v. Hill*, No. W2012-00733-CCA-R3-CD, 2013 WL 501753, at *13 (Tenn. Crim. App. Feb. 11, 2013) (citing *Schmeiderer*, 319 S.W.3d at 625).

only when the judge abuses his or her discretion—a standard that appellate courts are very familiar with in criminal cases. "A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence." *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010). In *State v. McCaleb*, this Court

> emphasize[d] that the abuse of discretion standard of review does not permit an appellate court to substitute its judgment for that of the trial court. *State v. Harbison*, 539 S.W.3d 149, 159 (Tenn. 2018). Rather, "[b]ecause, by their very nature, discretionary decisions involve a choice among acceptable alternatives, reviewing courts will not second-guess a trial court's exercise of its discretion simply because the trial court chose an alternative that the appellate courts would not have chosen." *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999). Accordingly, if the reviewing court determines that "reasonable minds can disagree with the propriety of the decision," the decision should be affirmed. Harbison, 539 S.W.3d at 159.

*State v. McCaleb*, 582 S.W.3d 179, 186 (Tenn. 2019) (second alteration in original).

Before we examine each of the defendant's contentions under the *Wainwright* standard (through the lens of our abuse of discretion standard of review), it is instructive to consider the voir dire process employed by the trial court in this case. Prior to the trial, prospective jurors completed an approved jury questionnaire[13] that included questions regarding the juror's feelings about the death penalty. One open-ended question, for example, simply asked the potential juror to express his or her opinion about the death penalty. Another question asked the juror to circle one of seven statements that best described the juror's view on the death penalty, including the extremes of automatically voting for the death penalty or never voting for the death penalty. The completed questionnaires were provided to counsel for the State and the defendant to allow them to prepare for jury selection. As jury selection began, the trial court allowed general questioning of the venire. The court then conducted individual voir dire on the issues of pretrial publicity and the death penalty. During the death qualification, counsel took turns asking each potential juror about his or her questionnaire responses and each juror was given an opportunity to elaborate further on his or her feelings about the death penalty. When the questioning and any rehabilitation attempts by counsel concluded, the court inquired into whether either party desired to challenge the potential juror for cause. The

---

[13] The questionnaires of the jurors who were selected were not included in the record on appeal. The defendant filed a motion to supplement the record with the questionnaires of the jurors in question, which we denied. The relevant questions and answers were read into the record during individual voir dire, allowing this Court to conduct a sufficiently thorough review.

trial court made its ruling on the record for each challenge.

*Defendant's Challenges for Cause*

We first review the defendant's argument that the trial court erred in failing to excuse for cause prospective jurors Robinson, Little, and Graves. The defendant complains that as a result of the court's error, he was forced to use peremptory challenges to strike them. We will consider each challenge for cause in turn to determine whether the trial court abused its discretion in making its decision under the *Wainwright* standard.

Prospective juror Robinson indicated on his jury questionnaire that "we need the death penalty in some cases." He also circled the response, "I believe that the death penalty is the appropriate form of punishment in some murder cases. I could return a verdict of death if I believed it was warranted in a particular case, depending on the evidence, the law, and what I learned about the defendant." During individual voir dire, Mr. Robinson initially stated that, due to the costs associated with keeping a person imprisoned for life, a sentence of life without the possibility of parole was not an appropriate punishment. Upon further questioning, however, Mr. Robinson indicated he could fairly consider all three forms of punishment for first-degree murder. When questioned by defense counsel, Mr. Robinson explained that he believed the death penalty was an appropriate punishment for a premeditated killing. However, he told the court he did not consider a killing during a robbery to be premeditated. In challenging Mr. Robinson for cause, the defendant focused on Mr. Robinson's response that he would impose the death penalty for a premeditated killing. The trial court denied the defendant's challenge for cause, having determined Mr. Robinson could follow the law and consider all sentencing options.

The defendant argues that based on Mr. Robinson's answer, he was inclined to impose the death penalty and should have been excused for cause. Indeed, Mr. Robinson expressed his belief that the death penalty was the appropriate punishment for a premeditated killing. However, he indicated he would not automatically impose the death penalty and could fairly consider all three forms of punishment. Viewing Mr. Robinson's responses in their entirety, rather than any single response in isolation, the defendant has failed to prove that the trial court abused its discretion in denying his challenge of Mr. Robinson for cause.

Prospective juror Little noted on her questionnaire that she has "no problem with [the death penalty]" if a defendant is guilty. She also circled the response, "I believe that the death penalty is the appropriate form of punishment in some murder cases. I could return a verdict of death if I believed it was warranted in a particular case, depending on the evidence, the law, and what I learned about the defendant." Ms. Little indicated she could consider life without parole; however, she did not believe a sentence of life with the

possibility of parole[14] was appropriate for "taking a life" unless the person acted in self-defense. Ms. Little ultimately agreed she could follow the law and consider all three forms of punishment. During questioning, Ms. Little indicated she was familiar with the prosecutor through her brother who worked as a child support investigator and that her husband was a retired police officer.  She further informed the court she may have a hardship because she cared for her elderly mother, was on pain medication, and had difficulty sitting on a wooden bench for long periods of time. Defense counsel challenged Ms. Little for cause based on her "heavy ties" to law enforcement and her hardship issues. In denying the challenge, the trial court found no evidence that the medication affected Ms. Little's ability to make decisions or that Ms. Little had a significant connection to law enforcement. The trial court concluded that Ms. Little could fairly consider all possible sentencing options.

The defendant argues that Ms. Little should have been excused for cause because of her familiarity with the prosecutor and her equivocal views on the death penalty. Ms. Little disclosed that she knew the prosecutor through her brother who worked as a child support investigator. However, neither party elicited responses that revealed any significant connection between Ms. Little and the prosecutor or that suggested Ms. Little held a bias in favor of the State as a result of this connection. As to punishment, Ms. Little indicated the death penalty was an appropriate punishment in some murder cases depending on the evidence and what she learned about the defendant. Ms. Little's only hesitation related to the imposition of a life sentence that carried the possibility the defendant could be released on parole. Ms. Little's reluctance was satisfactorily addressed by the trial court, and Ms. Little ultimately indicated she could fairly consider all three forms of punishment. The defendant has failed to prove the trial court abused its discretion in refusing to excuse Ms. Little for cause.

Prospective juror Graves circled the response on her questionnaire that "[a]lthough I do not believe that the death penalty ever ought to be imposed, as long as the law provides for it, I could impose it if I believed it was warranted in a particular case, depending on the evidence, the law, and what I learned about the defendant." During individual voir dire she retracted her questionnaire response, stating she believed in the death penalty under certain circumstances. Ms. Graves said she was "probably" inclined to impose the death penalty for premeditated murder but that she would have to "weigh everything that's presented."

---

[14] Throughout the trial court proceedings, the court and the parties referred to the statutory punishment of "imprisonment for life," Tennessee Code Annotated section 39-13-202(c)(3), as "life with parole." The Court of Criminal Appeals offered a thorough explanation of the difference between "imprisonment for life" and "life imprisonment without possibility of parole," Tennessee Code Annotated section 39-13-202(c)(2), and of why "[a]rguably, there is no 'parole' from a sentence of imprisonment for life." *Miller*, 2020 WL 5626227, at *12.

Although Ms. Graves did not believe life with the possibility of parole was an appropriate punishment, she said she would follow the law and consider all three forms of punishment. Ms. Graves indicated she had served on a capital jury in the 1980s but that the jury did not return a sentence of death. Aside from the issue of punishment, Ms. Graves said she had known the lead prosecutor for years because he attended school with her daughters. However, she did not believe the relationship would affect her ability to hear the case. Ms. Graves also informed the court that her husband was on insulin and was adjusting to a new insulin pump. She expressed concern about her husband's ability to regulate the pump; however, she said her husband promised to adjust the pump in her absence. Finally, Ms. Graves informed the court that she occasionally faints at the sight of blood. The defendant challenged Ms. Graves for cause based on her responses regarding the death penalty; her tendency to faint; and her husband's health. The trial court denied the motion, finding Ms. Graves was qualified to serve and would fairly consider all sentencing options.

The defendant argues that the trial court erred in refusing to excuse Ms. Graves for cause. He complains that the relationship between Ms. Graves and the lead prosecutor was "too close" and that Ms. Graves was predisposed to trust him. The defendant argues further that, based on her responses, Ms. Graves would be inclined to favor the death penalty. The issue of Mr. Graves' health was not pursued on appeal. Although isolated responses suggest Ms. Graves might be inclined to impose the death penalty, Ms. Graves said her decision about punishment would depend on the evidence presented. Ultimately, Ms. Graves indicated that she would follow the law and consider all three forms of punishment. Viewing Ms. Graves' responses as a whole, the defendant has failed to prove that the trial court abused its discretion in denying the defendant's challenge for cause.

*State's Challenges for Cause*

Next, we consider the defendant's contention that the trial court erred in granting, over his objection, the State's challenges for cause of prospective jurors Eads, Milhorn, and Sesti. He suggests in each instance that when viewing the prospective jurors' collective responses their excusal was not warranted under the *Wainwright* standard.

Prospective juror Eads indicated on his questionnaire that he believed the death penalty was "fair for the crime" and that he could consider all three forms of punishment for first-degree murder. He accidentally circled more than one response to the multiple-choice question about the death penalty because he was confused by the questionnaire. During individual voir dire, Mr. Eads clarified that he believed the death penalty should never be imposed. He subsequently explained that he did not believe anyone should be put to death unless that person killed several people. In his next response, Mr. Eads said he would not fairly consider the death penalty as punishment. When defense counsel attempted to rehabilitate Mr. Eads, he asked counsel if he was being forced to impose the

death penalty. Mr. Eads said he probably could not impose the death penalty in this case because the defendant "did not kill multiple people." Mr. Eads grew frustrated and said he was confused "over the whole thing." The State challenged Mr. Eads for cause because of his inconsistent responses and his inability to fairly consider the death penalty and otherwise follow the law. The trial court agreed and excused Mr. Eads for cause over the defendant's objection.

Prospective juror Milhorn indicated on her questionnaire that she was "[n]ot sure about the death penalty or that [she] would want that decision." She also circled the response, "I believe that the death penalty is the appropriate form of punishment in some murder cases, but I could never return a verdict of death." When questioned by the State during individual voir dire, Ms. Milhorn reluctantly agreed that the death penalty could be appropriate in certain circumstances, suggesting she could possibly impose the death penalty as part of a jury. However, Ms. Milhorn made it clear that given the choices of life and life without parole she would disregard the death penalty. When the trial court questioned Ms. Milhorn, she said she could consider the death penalty if the person acted "intentionally and was vicious" or "would be a threat to someone else." The State challenged Ms. Milhorn for cause based on her responses. The trial court granted the motion based on Ms. Milhorn's equivocal answers including her response that she would not impose the death penalty if there were other options.

Prospective juror Sesti indicated that she had a hardship with being sequestered because her fifteen-year-old son would be home alone without transportation to school or tennis practice. When Ms. Sesti spoke to her husband about the questionnaire and upcoming trial, her husband responded "don't get sequestered." Ms. Sesti said she and her husband had not talked about alternative transportation for their son "because we were hoping I wouldn't get picked." In questionnaire responses about the death penalty, Ms. Sesti wrote "I guess it depends on the circumstances. I am not for it or against it." She also circled a response indicating "[a]lthough I do not believe that the death penalty ever ought to be imposed, as long as the law provides for it, I could impose it if I believed it was warranted in a particular case, depending on the evidence, the law, and what I learned about the defendant." During individual voir dire, Ms. Sesti expressed doubt that she could impose the death penalty or put her name on a verdict form imposing death. She added that she could "probably not" impose the death penalty because of her religious beliefs. When questioned by the trial court, Ms. Sesti repeatedly responded that she did not know if she could impose a sentence of death. The State challenged Ms. Sesti for cause because she was either "incapable or unwilling" to answer the questions so as to allow the parties to assess her ability to serve as a juror. The trial court excused Ms. Sesti for cause because the court was not certain Mr. Sesti would be able to vote for the death penalty even if it were warranted.

These three prospective jurors share a common opposition to the death penalty. Most importantly, however, these prospective jurors expressed sincere doubt as to whether they could impose the death penalty as punishment, particularly given other sentencing options. The *Wainwright* standard applies equally to this category of prospective jurors.[15] *See Uttecht,* 551 U.S. at 22. In our review of the collective responses of each of these three prospective jurors as summarized above, it is abundantly clear that none of them would fairly consider the death penalty. Thus, the record supports the trial court's determination that these jurors could not follow the law. The defendant has failed to prove that the trial court abused its discretion in excusing these jurors for cause.

*Exhaustion of Peremptory Challenges*

Finally, we consider the defendant's argument that the trial court erred when it failed to excuse juror Crum for cause after the defendant had exhausted all of his peremptory challenges. The defendant argues that seating juror Crum resulted in a jury that was not fair and impartial. In this posture, the error is grounds for reversal only if an incompetent juror is forced upon the defendant. *See Ross v. Oklahoma*, 487 U.S. 81, 89 (1988); *State v. Howell*, 868 S.W.2d 238, 248 (Tenn. 1993). Accordingly, our inquiry is whether Ms. Crum was "incompetent" such that her "forced" presence on the jury deprived the defendant of a fair and impartial jury.

Juror Crum was questioned as a "replacement juror" after the parties exercised peremptory challenges as to the jurors initially seated. Ms. Crum was present during the questioning in open court but, as with the other jurors, the trial court allowed the parties to conduct individual voir dire in a separate room. Ms. Crum was reminded of her questionnaire response, "I am in favor of the death penalty if no doubt of crime committed." The State explained that Tennessee utilizes a "reasonable doubt . . . not 100 percent" standard and asked Ms. Crum if she would require the State to meet this higher burden. Ms. Crum simply replied that she would not want to put an innocent person to death. Ms. Crum also circled the response, "I believe that the death penalty is the appropriate form of punishment in some murder cases and I could return a verdict of death if I believed it was warranted in a particular case depending on the evidence, the law and what I learned about the defendant." Ms. Crum said her opinion had not changed since completing the questionnaire, adding that she had not heard the evidence. When advised of the three possible punishments for first-degree murder, Ms. Crum expressed her reluctance to consider a life sentence for a premeditated murder conviction if the defendant could be released on parole. Even when informed that life with parole meant the defendant would

---

[15] In clarifying the earlier rule announced in *Witherspoon v. Illinois*, the *Wainwright* court noted that even the *Witherspoon* court recognized the State's legitimate interest in excluding jurors whose opposition to the death penalty would not allow them to view the proceedings impartially and whose views would prevent them from imposing the death penalty within the framework of the law. *Wainwright*, 469 U.S. at 416.

serve at least 51 years before being eligible for parole, Ms. Crum said she was still "leaning more toward" her position that such a person should not be eligible for parole. She again indicated that she would have to hear the evidence. When defense counsel asked Ms. Crum if she would have trouble seriously considering a life sentence with the possibility of parole, Ms. Crum said she would "consider it with the evidence." When the trial court pressed her further, Ms. Crum said she would consider the three options "evenly" depending on the evidence.

As stated above, by this time, the defendant had exhausted his peremptory challenges. Defense counsel challenged Ms. Crum for cause based on her inability to fairly consider a life sentence. The defense argued Ms. Crum placed the burden on the defendant to convince her a life sentence would be appropriate. The State responded that Ms. Crum indicated on more than one occasion that she would consider all three forms of punishment. The trial court agreed and denied the defendant's motion to excuse her for cause. Ms. Crum was seated on the jury.

We note that the *Wainwright* standard focuses primarily on challenges for cause based on a potential juror's views on the death penalty. Ms. Crum's responses clearly indicate she could fairly consider the death penalty as a possible punishment for first-degree murder. Of course, during "death qualification," a trial court must also be concerned with whether a juror's views on the other two forms of punishment would substantially impair her ability to follow her instructions and her oath. Indeed, to be "competent," a juror in this setting must also be able to fairly consider a sentence of imprisonment for life or imprisonment for life without the possibility of parole as provided by statute. Ms. Crum explicitly indicated she could consider a sentence of life without the possibility of parole. The narrow focus here is whether the record establishes that Ms. Crum could consider a life sentence, and therefore, competently serve as an impartial juror.

Without question, many of Ms. Crum's responses suggest she would have difficulty considering a life sentence for a premeditated killing. However, in each instance, Ms. Crum repeated that she would have to hear the evidence before making a punishment decision. Her "leaning" toward the other two possible punishments is not fatal, however, because Ms. Crum told the court that she could consider all three forms of punishment. In denying the challenge for cause, the trial court explained that it attempted to question Ms. Crum about her ability to consider all three sentences in a "non-leading fashion." Because the trial court viewed Ms. Crum's demeanor during the questioning, we must defer to its findings. Although Ms. Crum presents a closer question, the defendant has not proven the trial court abused its discretion in denying the challenge for cause. Accordingly, the defendant has not established that he was forced to accept an incompetent juror or otherwise denied a fair and impartial jury.

## B. Sufficiency of the Evidence

The defendant argues that the evidence was insufficient to support his convictions for first-degree premeditated murder, first-degree felony murder, attempted especially aggravated robbery, attempted second-degree murder, aggravated assault, and employing a firearm during the attempt to commit a dangerous felony.

The standard for appellate review of a claim challenging the sufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, the defendant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct evidence, circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (citing *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

On appellate review, "we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom." *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *see also State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This Court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *See Dorantes*, 331 S.W.3d at 379; *State v. Lewter*, 313 S.W.3d 745, 747 (Tenn. 2010); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). Because a jury conviction removes the presumption of innocence that the defendant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted defendant, who must demonstrate to this Court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729.

In conducting our sufficiency review, we must evaluate the proof in light of the elements of the crime. *See State v. Gentry*, 538 S.W.3d 413, 420 (Tenn. 2017) (recognizing that the first step of a sufficiency review is to "'examine the relevant statute(s) in order to determine the elements' of the offense that must be proven by the prosecution beyond a

reasonable doubt") (quoting *State v. Stephens*, 521 S.W.3d 718, 723-24 (Tenn. 2017)). However, before we examine the statutory elements of each of these offenses, we consider the defendant's overriding argument that the State failed to prove his identity as the perpetrator of any of the offenses.

*Identity*

It is well established that the identity of the perpetrator is an essential element of any crime. *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citing *State v. Thompson*, 519 S.W.2d 789, 793 (Tenn. 1975)). Identity may be established by circumstantial evidence alone. *See State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). In prior identity cases, including *Rice*, the Court applied the standard of review for circumstantial evidence in effect at the time. As noted, however, our standard of review is now the same for direct and circumstantial evidence, including the evidence presented at the trial to establish the element of identity. *See Dorantes*, 331 S.W.3d at 381.[16]

In this case, none of the witnesses could identify the perpetrator. However, all of the witnesses consistently testified that the man was wearing dark colored clothing with a white mask covering much of his face. Mr. Austin testified that he "believe[d] the person was black." At least two of the witnesses saw the perpetrator's direction of travel upon fleeing the market. Several police officers were in the vicinity and arrived on the scene in minutes. A K-9 officer tracked the suspect to a wooded area near Lions' Field. The officers recovered dark clothing, a white cloth portion of a t-shirt, gray gloves, a weapon, a cell phone, and keys. Testing conducted by the TBI revealed that the defendant's DNA was found on the dark hooded sweatshirt, the black pants, the gray gloves, the white t-shirt fabric, and on the revolver; that the cell phone was registered to the defendant; that the keys fit the defendant's home and a car parked near his home; that the gray gloves tested positive for gunshot residue; and that the white t-shirt portion found in the woods was cut or ripped from a t-shirt recovered from the defendant's home. Presuming the jury afforded the State all reasonable inferences from this evidence, we conclude the evidence was more than sufficient to establish the identity of the defendant as the perpetrator of these offenses.[17]

---

[16] *Dorantes* replaced the standard previously applied in circumstantial evidence cases that required the facts to be "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone." *Rice*, 184 S.W.3d at 662 (quoting *Reid*, 91 S.W.3d at 277). Our Court of Criminal Appeals properly rejected a defendant's invitation to carve out an exception to *Dorantes* to retain the former circumstantial evidence standard of review in identity cases. *See State v. Harris*, No. W2017-01706-CCA-R3-CD, 2018 WL 6012620 at *8 (Tenn. Crim. App. Nov. 15, 2018), *perm. app. denied*, (Tenn. Mar. 28, 2019).

[17] We note that the defendant's only challenge to the sufficiency of the evidence to support his conviction of attempted especially aggravated robbery is that the State failed to prove identity. Because we have

Turning to the statutory elements, we next consider whether the evidence was sufficient to support each of the challenged offenses.

*First-degree Premeditated Murder*

The jury convicted the defendant of the first-degree premeditated murder of Mr. Dhalai. First-degree murder is a "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (2018). The statute also provides that

> "premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* § 39-13-202(e). The defendant argues the State failed to establish the element of premeditation.

As with each element of an offense, the State must prove premeditation beyond a reasonable doubt. Premeditation may be supported by either direct or circumstantial evidence. *State v. Brown*, 836 S.W.2d 530, 541 (Tenn. 1992). Whether a defendant acted with premeditation is a question of fact for a jury to decide. *State v. Clayton*, 535 S.W.3d 829, 845 (Tenn. 2017) (citing *State v. Dotson*, 450 S.W.3d 1, 86 (Tenn. 2014); *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003)). The jury may infer premeditation from several factors including: "the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing." *Id.* (citing *Davidson*, 121 S.W. 3d at 614-15). The jury may also consider "a lack of provocation on the victim's part and a defendant's failure to render aid to a victim." *Id.* (citing *Finch v. State*, 226 S.W.3d 307, 318-19 (Tenn. 2007)).

The defendant entered the market armed with a deadly weapon wearing clothing that would conceal his identity. In slang terms, the defendant instructed the unarmed clerk to give him the money from the cash register or he was "gonna shoot [the victim] dead in the head." When the victim hesitated, the defendant fired a warning shot near the victim's

_____

concluded the evidence was sufficient to establish the defendant as the perpetrator of all of the offenses, this issue requires no further analysis.

head. After repeating his demand to open the cash drawer, the defendant shot the victim in the head without provocation as the victim slowly turned to walk away. The defendant then fired a shot in the direction of another employee. As the victim lay dying, the defendant unsuccessfully attempted to open the cash register before fleeing the market. He abandoned his weapon and clothing in a nearby baseball field in an apparent attempt to conceal his identity as the perpetrator.

The defendant suggests that his demands could have been viewed as a tactic to convince the victim to hand over the money rather than as a threat of violence. He further asserts the defendant's quick reaction in shooting the victim as he turned to walk away supports an inference that this was, at most, a knowing killing. Viewing the context of all of the circumstances surrounding the killing, the jury had more than sufficient evidence from which to conclude that the defendant acted with premeditation. This issue is without merit.

### First-degree Felony Murder

The jury also convicted the defendant of first-degree felony murder of Mr. Dhalai. In relevant part, the statute provides that felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery." Tenn. Code Ann. § 39-13-202(a)(2). No culpable mental state is required for the killing except the intent to commit the underlying offense. *Id.* § 39-13-202(b). The defendant argues that the killing of the victim and the attempted robbery were not sufficiently connected to support his conviction for felony murder.

To fall within the definition of felony murder, the killing must be "done in pursuance of the unlawful act, and not collateral to it." *State v. Banks*, 271 S.W.3d 90, 140 (Tenn. 2008) (quoting *Rice*, 184 S.W.3d at 663). The killing "may precede, coincide with, or follow the felony" and still be considered "in the perpetration of" the felony "so long as there is a connection in time, place, and continuity of action." *State v. Thacker*, 164 S.W.3d 208, 223 (Tenn. 2005) (quoting *State v. Buggs*, 995 S.W.2d 102, 106 (Tenn. 1999)). The proof must establish that the defendant had the intent to commit the underlying felony either prior to or concurrent with the act causing the victim's death.

Without question, the proof established that the defendant entered the market with the intent to commit a robbery. The defendant threatened to kill the victim if he refused to give him the money from the cash register. The defendant fired a warning shot followed shortly by the fatal shot. There was ample evidence for the jury to infer that the defendant saw the victim as the only thing standing between him and the cash drawer. Thus, the proof established that the defendant had the intent to commit the robbery prior to the shooting that caused the victim's death. This close connection was sufficient to support his

21

conviction for felony murder. This issue has no merit.

*Attempted Second-degree Murder/Aggravated Assault*

The defendant was convicted of the attempted second-degree murder of Mr. Austin. Second-degree murder is "[a] knowing killing of another." Tenn. Code Ann. § 39-13-210 (2018). To prove *attempted* second-degree murder, the State was required to prove that the defendant took a substantial step toward committing a knowing killing of Mr. Austin. *See* Tenn. Code Ann. §39-12-101(a)(3) (2018). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b) (2018). Thus, as for the defendant's intent, the State was only required to prove that the defendant knew his actions were reasonably certain to cause Mr. Austin's death. *See State v. Brown*, 311 S.W.3d 422, 432 (Tenn. 2010). Whether the defendant acted "knowingly" is a question of fact for the jury and may be inferred from the surrounding facts and circumstances. *Id.*

The evidence established that the defendant noticed Mr. Austin when he entered the market. After fatally shooting Mr. Dhalai but before jumping over the counter to gain access to the cash register, the defendant fired a shot in the direction of Mr. Austin, who was attempting to move to safety. The defendant places significance on Mr. Austin's testimony that the man (later identified as the defendant) never made any direct statements or threats to him. He also emphasizes that a single shot was fired in Mr. Austin's direction. Indeed, the jury heard the evidence and later received instructions about lesser-included offenses. Nonetheless, the jury concluded the defendant's gunshot in Mr. Austin's direction was a "substantial step" toward a knowing killing and that the defendant knew his conduct was reasonably certain to cause Mr. Austin's death, having fatally wounded Mr. Dhalai just seconds before. The evidence was sufficient to support his conviction for attempted second-degree murder.

In passing, the defendant makes the same argument as to his conviction for the aggravated assault of Mr. Austin. Under this alternative theory, the State was required to show that the defendant committed an assault by "[i]ntentionally or knowingly caus[ing] another to reasonably fear imminent bodily injury" involving the use or display of a deadly weapon. Tenn. Code Ann. §§ 39-13-101(a)(2), -102(a)(1) (2018 & Supp. 2020). Again, the proof clearly established that the defendant caused Mr. Austin to reasonably fear imminent bodily injury by firing the shot in his direction. These issues are likewise without merit.

*Employing a Firearm*

Finally, the defendant was convicted of employing a firearm during his attempt to commit a dangerous felony. Under the statute, it is an offense to employ a firearm during

the attempt to commit a dangerous felony. Tenn. Code Ann. § 39-17-1324 (2018 & Supp. 2020). Attempted second-degree murder is one of the enumerated dangerous felonies. *See id.* § 39-17-1324(i)(1)(B). The defendant's argument relates back to his argument that the evidence was insufficient to support his conviction for attempted second-degree murder. He submits that if his conviction for attempted second-degree murder is reversed, his conviction for employing a firearm during the commission of a dangerous felony must also be reversed. For the reasons explained above, the Court concluded the evidence was sufficient to support the attempted second-degree murder conviction. Accordingly, this argument also fails.

## C. Video Recording of Prior Robbery

The defendant argues the trial court erred in allowing the State to introduce during the penalty phase a video recording of his prior aggravated robbery. The defendant previously pleaded guilty to aggravated robbery of a convenience market in Madison County, Tennessee. Prior to trial, the State gave notice of its intent to use this prior aggravated robbery conviction to establish the (i)(2) statutory aggravating circumstance. In addition, the State provided the defendant with a copy of a surveillance video that captured the defendant's actual participation in the prior aggravated robbery.

The defendant filed a pre-trial motion in limine to exclude the video pursuant to Tennessee Rule of Evidence 403 because its probative value was substantially outweighed by the danger of unfair prejudice. The defendant argued the certified judgment of conviction would have sufficed. The State maintained the evidence was admissible under Tennessee Code Annotated section 39-13-204(c). After considering the arguments and viewing the video, the trial court denied the motion, concluding the evidence was reliable and relevant to establish the (i)(2) aggravating circumstance based on section 39-13-204(c) and *State v. Reid.* The surveillance video was played to the jury during the penalty phase.

The defendant raised this issue on direct review, and the Court of Criminal Appeals concluded the trial court did not abuse its discretion. *Miller*, 2020 WL 5626227 at *19. The defendant continues to argue in this Court that admission of the video was error. The introduction of evidence at the penalty phase is governed by Tennessee Code Annotated section 39-13-204(c) which provides as follows:

> (c) In the sentencing proceeding, evidence may be presented as to any matter that the court deems relevant to the punishment, and may include, but not be limited to, the nature and circumstances of the crime; the defendant's character, background history, and physical condition; any evidence tending to establish or rebut the aggravating circumstances enumerated in subsection (i); and any evidence tending to establish or rebut any mitigating factors. Any

such evidence that the court deems to have probative value on the issue of punishment may be received, regardless of its admissibility under the rules of evidence; provided, that the defendant is accorded a fair opportunity to rebut any hearsay statements so admitted. However, this subsection (c) shall not be construed to authorize the introduction of any evidence secured in violation of the constitution of the United States or the constitution of Tennessee. **In all cases where the state relies upon the aggravating factor that the defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person,** *either party shall be permitted to introduce evidence concerning the facts and circumstances of the prior conviction.* **Such evidence shall not be construed to pose a danger of creating unfair prejudice, confusing the issues, or misleading the jury and shall not be subject to exclusion on the ground that the probative value of the evidence is outweighed by prejudice to either party. Such evidence shall be used by the jury in determining the weight to be accorded the aggravating factor.** The court shall permit a member or members, or a representative or representatives of the victim's family to testify at the sentencing hearing about the victim and about the impact of the murder on the family of the victim and other relevant persons. The evidence may be considered by the jury in determining which sentence to impose. The court shall permit members or representatives of the victim's family to attend the trial, and those persons shall not be excluded because the person or persons shall testify during the sentencing proceeding as to the impact of the offense.

Tenn. Code Ann. § 39-13-204(c) (emphasis added). The bold/italic language resulted from the 1998 amendment to the statute. *See generally State v. Odom*, 137 S.W.3d 572 (Tenn. 2004) (discussing the 1998 amendment to section 39-13-204(c)). Unlike the prior version, the current statute specifically authorizes the introduction of evidence concerning the facts and circumstances of the prior violent felony.

The statute reflects the reality that, although a capital case, the rules of evidence are somewhat relaxed during a capital sentencing hearing. *Cf. Reid*, 91 S.W.3d at 305 (Birch, J., concurring in part and dissenting in part) (explaining that the Rules of Evidence should not be applied to preclude the introduction of otherwise reliable evidence that is relevant to the issue of punishment in the capital sentencing arena). In fact, the 1998 amendment seems to suggest that Tennessee Rule of Evidence 403 does not routinely impede the admission of such evidence.

Although such a video recording is somewhat prejudicial by its very nature, we cannot conclude that its probative value was outweighed by the danger of unfair prejudice

when properly introduced at the penalty phase pursuant to section 39-13-204(c) after the defendant's guilt had been determined. Accordingly, the trial court did not abuse its discretion in admitting the surveillance video of the prior aggravated robbery.

### D. Constitutionality of the Death Penalty/Lethal Injection

The defendant maintains that the death penalty in general, and lethal injection in particular, violate the United States and Tennessee Constitutions' prohibitions on cruel and unusual punishment. U.S. Const. amend. VIII; Tenn. Const. art. I, § 16. He acknowledges, however, that these arguments have been rejected by both the United States Supreme Court and this Court. *See Baze v. Rees*, 553 U.S. 35, 47 (2008); *Keen v. State*, 398 S.W.3d 594, 600 n.7 (Tenn. 2012); *Abdur'Rahman v. Bredesen*, 181 S.W.3d 292, 309 (Tenn. 2005). The defendant urges this Court to reconsider its earlier precedent and conclude that capital punishment, and the use of lethal injection to carry out the death penalty, constitutes cruel and unusual punishment and should therefore be invalidated in Tennessee as a possible punishment for first-degree murder. We respectfully decline the defendant's invitation, and we reaffirm our prior holdings.

### E. Mandatory Review of Death Sentence

This Court is statutorily required to review the defendant's death sentence. Tenn. Code Ann. § 39-13-206(a)(1) (2018). Our review includes analyzing whether (1) the death sentence was imposed in any arbitrary fashion; (2) the evidence supports the jury's findings of statutory aggravating circumstances; (3) the evidence supports the jury's finding that the aggravating circumstances outweighed any mitigating circumstances; and (4) the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant. *Id.* § 39-13-206(c)(1)(A)-(D).

### *Imposition of the Death Penalty*

Our first consideration is whether the death penalty was imposed arbitrarily in this case. The record indicates the trial court properly instructed the jury at the penalty phase of the trial. The jury unanimously determined that the State had proven the aggravating circumstances beyond a reasonable doubt and that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt. Our review indicates the trial court conducted the penalty phase in strict compliance with the applicable statutory provisions and the Tennessee Rules of Criminal Procedure. Accordingly, as to the first consideration, we can conclude the sentences of death were not imposed in an arbitrary fashion.

*Sufficiency of the Evidence Establishing Aggravating Circumstances*

Our second consideration is whether the evidence supports the jury's findings of statutory aggravating circumstances. The relevant inquiry is whether a rational jury, taking the evidence in the light most favorable to the State, could have found the existence of the aggravating circumstances beyond a reasonable doubt. *Clayton*, 535 S.W.3d at 850; *State v. Kiser*, 284 S.W.3d 227, 272 (Tenn. 2009). In the instant case, the jury found two aggravating circumstances. Therefore, we conduct an independent review to determine whether the evidence presented at the penalty phase was sufficient to support the jury's findings.

The penalty phase jury verdict forms indicate the jury unanimously found the State had proven beyond a reasonable doubt the following two statutory aggravating circumstances as to both first-degree murder convictions:

> (2) The defendant was previously convicted of one (1) or more felonies, other than the present charge, the statutory elements of which involve the use of violence to the person;
>
> . . . .
>
> (7) The murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit, any aggravated robbery.

Tenn. Code Ann. § 39-13-204(i)(2), (7). In support of the (i)(2) aggravating circumstance, the State introduced a certified judgment indicating the defendant had been previously convicted of aggravated robbery in Madison County, a written statement signed by the defendant admitting his role in the prior robbery, the testimony of a victim in the robbery, and a video recording of the prior robbery that showed the defendant and two other men committing the robbery. As to the (i)(7) aggravating circumstance, the proof clearly established that the defendant "knowingly" murdered the victim at the market and obviously had a substantial role in the attempted aggravated robbery as the sole perpetrator. Indeed, the evidence is more than sufficient to support the jury's finding of these statutory aggravating circumstances.

In considering this prong, the Court of Criminal Appeals concluded that the (i)(7) aggravating circumstance cannot be applied to a conviction for felony murder, and therefore, vacated the application of this aggravating circumstance for the felony murder conviction. *Miller*, 2020 WL 5626227, at *21 (citing *State v. Middlebrooks*, 840 S.W.2d 317, 346 (Tenn. 1992), *superseded by statute as stated in State v. Pruitt*, 415 S.W.3d 180

26

(Tenn. 2013)). Indeed, this Court determined in *Middlebrooks* that the (i)(7) aggravating circumstance could not support the death penalty for a defendant convicted solely of felony murder because the then-existing aggravating circumstance and felony murder statute contained duplicative language. *Middlebrooks*, 840 S.W.2d at 346. However, as the Court explained in *State v. Banks*,

> The Tennessee General Assembly responded to [*Middlebrooks*] in 1995 by amending the aggravating circumstance in Tenn. Code Ann. § 39–13–204(i)(7) to require that the murder "was *knowingly* committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit" one of the enumerated felonies. This amendment narrowed the class of offenders to whom the death penalty could be applied sufficiently so as to leave no *State v. Middlebrooks* problem *even in cases where Tenn. Code Ann. § 39–13–204(i)(7) was the only aggravating circumstance established and the conviction was for felony murder*.

*Banks*, 271 S.W.3d at 152 (emphasis added) (footnote omitted). As noted, the jury in this case specifically found the State had proven the (i)(7) aggravating circumstance with the "knowing" requirement beyond a reasonable doubt. Accordingly, the portion of the judgment of the Court of Criminal Appeals vacating the application of the (i)(7) aggravating circumstance to the felony murder conviction is reversed.

*Aggravating Circumstances Outweigh Mitigating Circumstances*

In our third consideration, we are required to determine whether the evidence supports the jury's finding that the statutory aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt. After the State presented its penalty phase evidence, the defendant called Dr. James Walker, who diagnosed the defendant with cognitive disorder, cannabis use disorder, PTSD, and antisocial personality disorder. According to Dr. Walker, the defendant had an IQ of 78 at the age of eight. The defendant also called Dr. Keith Caruso, who agreed with Dr. Walker's diagnosis but further emphasized the defendant's childhood instability. In rebuttal, the State presented the testimony of Dr. Kimberly Brown, who generally agreed with Dr. Walker's diagnosis with the exception of the PTSD diagnosis.

At the close of the penalty phase evidence, the trial court instructed the jury regarding the State's burden to establish any aggravating circumstances beyond a reasonable doubt and further establish that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt. The trial court instructed the following as to mitigation:

Tennessee law provides that in arriving at the punishment, the jury shall consider as previously indicated any mitigating circumstances raised by the evidence which shall -- which shall include, but are not limited to, the following:

1. There are choices other than sentence of death.

2. Life without parole means that Urshawn Miller will never be released from prison.

3. If Mr. Miller is sentenced to life without possibility of parole, he will die in prison.

4. Mr. Miller has a mother, two aunts, an uncle, a brother, a sister, and other close family members. Mr. Miller's execution would have a devastating lifetime impact on all of these family members.

5. If Mr. Miller is executed, his execution will not undo the harm suffered by Mr. Dhalai's family, but life without parole will provide Mr. Miller the time to reflect on Mr. Dhalai's death for the rest of his life.

6. Mr. Miller suffers from mental disorders due to circumstances beyond his control, including genetics, abuse, neglect, trauma, and other upbringing and environmental factors.

7. Any other mitigating factor which is raised by the evidence produced by either the prosecution or defense at either the guilt or sentencing hearing. That is, you shall consider any aspect of the Defendant's character or record or any aspect of the circumstances of the offense favorable to the Defendant, which is supported by the evidence.

The Defendant does not have the burden of proving a mitigating circumstance. There is no requirement of jury unanimity to any particular mitigating circumstance or that you agree on the same mitigating circumstance.

Thus, after hearing the State's evidence supporting the statutory aggravating circumstances and the defendant's mitigating evidence, it was within the jury's purview to conclude that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt. The record supports this conclusion.

28

Finally, we are statutorily required to review the defendant's sentence of death in order to determine whether it is excessive or disproportionate to the penalty imposed in similar cases. Our review is intended to determine whether the defendant's death sentence is aberrant, arbitrary, or capricious insofar as it is "disproportionate to the punishment imposed on others convicted of the same crime." *Bland*, 958 S.W.2d at 662 (quoting *Pulley v. Harris*, 465 U.S. 37, 43 (1984)). Our review employs the precedent-seeking method of comparative proportionality review, in which we compare this case with other cases involving similar crimes and similar defendants in order to "identify and invalidate the aberrant death sentence." *Thacker*, 164 S.W.3d at 233 (quoting *Bland*, 958 S.W.2d at 664). The relevant pool of cases consists of "those first degree murder cases in which the State sought the death penalty, a capital sentencing hearing was held, and the jury determined whether the sentence should be life imprisonment, life imprisonment without possibility of parole, or death." *Rice*, 184 S.W.3d at 679 (citing *State v. Godsey*, 60 S.W.3d 759, 783 (Tenn. 2001); *Bland*, 958 S.W.2d at 666).

While no crimes or defendants are identical, a death sentence is disproportionate if the case is "plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed." *Bland*, 958 S.W.2d at 668. Thus, in our proportionality review, we examine "the facts and circumstances of the crime, the characteristics of the defendant, and the aggravating and mitigating circumstances involved."[18] *State v. Stevens*, 78 S.W.3d 817, 842 (Tenn. 2002). More specifically, we consider

> (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victims' circumstances

---

[18] The dissent employs the phrases "worst of the worst" and "worst of the bad" in its proportionality assessment, referencing Justice Souter's dissent in *Kansas v. Marsh*, 548 U.S. 163 (2006), which cites *Roper v. Simmons,* 543 U.S. 551 (2005), and *Atkins v. Virginia,* 536 U.S. 304 (2002). The dissent also references the author's prior dissent in *Pruitt*, 415 S.W.3d 180. Indeed, as the dissent explains, *Roper* and *Atkins* established that the death penalty "must be limited to those offenders who commit 'a narrow category of the most serious crimes.'" *Roper*, 543 U.S. at 568 (quoting *Atkins*, 536 U.S. at 319). This narrowing principle is implemented through a state's capital sentencing scheme that includes certain enumerated aggravating circumstances. *See Roper*, 543 U.S. at 568 (citing *Godfrey v. Georgia*, 446 U.S. 420, 428-29 (1980) (plurality opinion)). Like most states, our General Assembly, via the adoption of certain aggravating circumstances, defined the types of first-degree murders that may warrant the death penalty in Tennessee. *See* Tenn. Code Ann. 39-13-204(g)(1). Defendants routinely challenge the constitutionality of various aggravating circumstances and frequently argue that a particular aggravating circumstance fails to adequately narrow death eligibility. However, once a jury has imposed a sentence of death in accordance with our statutory scheme and absent a categorical proportionality challenge, our review of the sentence includes mandatory proportionality review as set out in our statute. Thus, although the phrases "worst of the worst" and "worst of the bad" have made their way into capital case vernacular, neither phrase reflects a constitutional or statutory standard by which we are bound in this review.

including age, physical and mental conditions, and the victims' treatment during the killing; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effect upon non-decedent victims.

*Pruitt*, 415 S.W.3d at 213 (citing *Bland*, 958 S.W.2d at 667). We also consider several factors about the defendant, including his (1) record of prior criminal activity; (2) age, race, and gender; (3) mental, emotional, and physical conditions; (4) role in the murder; (5) cooperation with authorities; (6) level of remorse; (7) knowledge of the victim's helplessness; and (8) potential for rehabilitation. *Id.* at 213-14.

The defendant is a twenty-six-year-old African-American male who shot the victim in the head. He acted with premeditation, telling the victim he would shoot him dead if he failed to obey instructions and firing a shot that barely missed the victim before firing a second shot that hit the victim in the back of the head. The defendant then fired the gun a third time, directing deadly force toward another store employee. There was no provocation or justification for the shooting. This senseless killing was committed in the course of the defendant's attempt to commit a robbery. The proof of what occurred was very clear, as store surveillance cameras recorded the entire encounter. The defendant fled the scene afterwards, and he again threatened violence, this time against police officers in a standoff, before they apprehended him. The defendant presented proof of a troubled childhood and diagnoses of various mental health conditions; however, none of the witnesses opined the defendant was incompetent to stand trial or lacked the ability to express remorse or take responsibility for his actions. The defendant had a prior conviction for a similar aggravated robbery, and the jury found that this conviction supported the (i)(2) aggravating circumstance.

Upon our review of the record and the Tennessee Supreme Court Rule 12 reports,[19] we conclude that the death sentence imposed in this case is not excessive or disproportionate when compared to the penalty imposed in similar cases, including the following:

Larry McKay, an African-American male, was twenty-five years old when he and Michael Eugene Sample shot the unarmed store clerks, Benjamin Cooke and Steve Jones, during the course of a robbery of the L & G Sundry Store despite the clerks having complied with Mr. McKay's demands. *State v. McKay*, 680 S.W.2d 447, 448-49 (Tenn. 1984). At the penalty phase, Mr. McKay introduced evidence of his broken home. The jury

---

[19] Tennessee Supreme Court Rule 12 requires trial courts to file extensive reports in all cases in which the defendant is convicted of first-degree murder. These reports include data about the crime, the defendant, and the punishment imposed. *See* Tenn. Sup. Ct. R. 12(1) & app.

imposed the death penalty based on the (i)(2), (i)(3),[20] (i)(6),[21] and (i)(7) aggravating circumstances. *Sample v. State*, No. 02C01-9505-CR-00131, 1996 WL 551754, at *9 n.12 (Tenn. Crim. App. Sept. 30, 1996).

The (i)(7) aggravating circumstance was later invalidated pursuant to *Middlebrooks* but the error deemed harmless. *Sample v. State*, 82 S.W.3d 267, 276-79 (Tenn. 2002), *perm. app. denied*, (Tenn. Jan. 27, 1997).

Michael Wayne Howell, a Caucasian male, was twenty-seven-years old when he fatally shot the unarmed clerk, Alvin Kennedy, in the head during the robbery of a 7-Eleven Market. *Howell*, 868 S.W.2d at 245. At the penalty phase, Mr. Howell presented evidence that he suffered from brain damage and had a troubled childhood. *Id.* at 246. The jury imposed the death penalty based on the (i)(2) and (i)(7) aggravating circumstances. *Id.* at 247. The (i)(7) aggravating circumstance was later invalidated pursuant to *Middlebrooks* but the error was deemed harmless. *Id.* at 262.

Tyrone Chalmers, an African-American male, was twenty-one years old when he killed twenty-eight-year-old Randy Allen during a robbery. *State v. Chalmers*, 28 S.W.3d 913, 915 (Tenn. 2000). In August 1994, Mr. Chalmers and his accomplices happened upon the victim and the victim's cousin while looking for someone to rob. *Id.* at 915-16. Mr. Chalmers admitted to police that he forced the victim and the cousin to strip before robbing them of $3.00. *Id.* at 916. Mr. Chalmers fired his shotgun at the victim six times. *Id.* at 916. He admitted to killing the victim and expressed remorse for doing so. He was convicted of felony murder and especially aggravated robbery. *Id.* at 914. The jury imposed the death penalty based on the (i)(2) aggravating circumstance – Mr. Chalmers had been previously convicted of attempted especially aggravated robbery and attempted first degree murder for events occurring on the same date as the murder of Randy Allen. *Id.* at 916.

Paul Dennis Reid, Jr., a Caucasian male, was thirty-nine years old when he killed two unarmed Captain D's employees, sixteen-year-old Sarah Jackson and twenty-five year old Steve Hampton, during a robbery. *Reid*, 91 S.W.3d at 261. Mr. Reid presented several witnesses at the penalty phase who testified about various mental health issues as well as Mr. Reid's difficult childhood. *Id.* at 267-70. The jury imposed the death penalty based on the (i)(2), (i)(6), and (i)(7) aggravating circumstances. *Id.* at 265-66, 271.

In this sampling of cases, the respective juries in two of Tennessee's grand divisions

---

[20] "(3) The defendant knowingly created a great risk of death to two (2) or more persons, other than the victim murdered, during the act of murder[.]" Tenn. Code Ann. § 39-13-204(i)(3).

[21] "(6) The murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another[.]" Tenn. Code Ann. § 39-13-204(i)(6).

considered whether the death penalty was an appropriate punishment for males of similar ages who murdered one or more victims while attempting a robbery. In three of these cases, the victims were employees of retail establishments who were murdered during the defendant's attempt to rob the business. Like the defendant, these men had troubled childhoods, had committed prior violent felonies, and often had some type of chemical dependency. Yet, it is revealing that jurors from across our state believed each of these defendants deserved a sentence of death under our statutory scheme for these types of offenses.

Under our proportionality review, the instant case need not be identical to the other cases in every respect, and, as we have previously recognized, a death sentence is not disproportionate simply because another defendant received a life sentence under similar circumstances. Having compared the defendant's case with other cases in which the death penalty was imposed while acknowledging the differences, we can conclude the defendant's sentence of death is not an "aberrant death sentence" and is not "plainly lacking in circumstances" consistent with those cases in which the death penalty was imposed. The defendant is not entitled to relief on this basis.

### III. CONCLUSION

For the reasons set forth above, we reverse the portion of the judgment of the Court of Criminal Appeals that vacated the application of the (i)(7) felony murder aggravating circumstance to the felony murder conviction. We affirm the defendant's convictions and sentence of death.

The sentence of death shall be carried out as provided on the 17th day of October, 2022, unless otherwise ordered by this Court or other proper authority. It appearing that the defendant, Urshawn Eric Miller, is indigent, the costs of this appeal are taxed to the State of Tennessee.

_____
ROGER A. PAGE, CHIEF JUSTICE